1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
UNITED STATES OF AMERICA        :
3                               :  Case No. 1:15-CR-193
            vs.                 :
4                               :  (Judge Kane)
JAY EUGENE REED,                :
5                  Defendant    :

6

7              TRANSCRIPT OF SENTENCING PROCEEDINGS
             BEFORE THE HONORABLE YVETTE KANE
             UNITED STATES DISTRICT COURT JUDGE
8              OCTOBER 30, 2018; 1:30 P.M.
               HARRISBURG, PENNSYLVANIA
9

10  FOR THE GOVERNMENT:

11      Meredith A. Taylor, Assistant United States Attorney
        United States Attorney's Office
12      228 Walnut Street, Second Floor
        Harrisburg, PA  17101
13
FOR THE DEFENDANT:
14
        Thomas A. Thornton, Assistant Federal Public Defender
15      Federal Public Defender's Office
        100 Chestnut Street, Suite 306
16      Harrisburg, PA  17101

17  ALSO PRESENT:

18      Rebekah Billings, United States Probation Officer

19

20

21                      Lori A. Shuey
22            Federal Certified Realtime Reporter
                United States Courthouse
23            228 Walnut Street, P.O. Box 983
                Harrisburg, PA  17108-0983
24                    717-215-1270
               lori_shuey@pamd.uscourts.gov
25    Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

1                        I N D E X

2

3                    DEFENSE WITNESS

4  JOSEPH SILVERMAN, M.D.                              PAGE

5  Direct Examination by Mr. Thornton              16
   Cross-Examination by Ms. Taylor                 30
6  Examination by The Court                        52
   Redirect Examination by Mr. Thornton            57

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *THE COURT:*  Good afternoon, counsel.  Finally our
2   schedules have meshed.  Is the government prepared to proceed?
3          *MS. TAYLOR:*  Yes, Your Honor, we are.
4          *THE COURT:*  All right.
5          *MS. TAYLOR:*  Your Honor, this is the case of *United*
6   *States of America v. Jay Eugene Reed*, this court's Docket
7   1:15-CR-193.  Mr. Reed is present represented by Mr. Thornton.
8   Your Honor, today is the time and place set for a sentencing
9   hearing in Mr. Reed's case.
10          *THE COURT:*  Mr. Thornton, I received your sentencing
11   memo filed on Mr. Reed's behalf.  I understand that you have
12   read the presentence report and understand the calculations and
13   have some comment and testimony to offer on those calculations.
14          *MR. THORNTON:*  Not so much on the calculations
15   themselves, Your Honor.  We did have one objection to the
16   presentence report guideline calculation, but it did not affect
17   the eventual range.  Even if we had -- the objection had been
18   granted, it would not have affected the range.  So we don't
19   really have any objection to the calculation of the range, but
20   we are hoping Your Honor will consider a variance in this
21   matter.
22          *THE COURT:*  Okay.  So we'll work from the criminal
23   history category one, offense level 46.
24          *MR. THORNTON:*  Yes, Your Honor.
25          *THE COURT:*  What do you wish to offer on your client's

1    behalf?

2              MR. THORNTON:  Your Honor, the Jay Reed who sits here

3    next to me -- you can stay there.  That's all right.  The Jay

4    Reed who sits here next to me is not the same person who took

5    these pictures.  He's not the same person who was arrested in

6    2015.  And, in fact, he's not even the same person since 2015.

7              He's been in Dauphin County Prison and in Columbia

8    County Prison for over three years at this point, and he

9    suffered the hardships which we detailed in our motion for

10   hardship consideration in the presentence report -- or the

11   sentencing memorandum that we filed.

12             Your Honor, Jay Reed, since and even before his arrest

13   on this matter, was starting to show signs that things were

14   going wrong, that it wasn't really the Jay Reed who had lived

15   his life without any real problems up until this occurred.  His

16   memory started failing, his health was failing.  He seems to

17   have what Dr. Silverman will call a progressive dementia.

18             In fact, Your Honor, Mr. Reed was hospitalized last

19   week while he was at the Columbia County Prison.  He was having

20   some episodes which made the prison worried enough that they

21   took him to the hospital and gave him some new medication, ran

22   a lot of tests on him, and I think we're still awaiting the

23   results of those tests.

24             He's not the same person today that he ever was.

25   Fifty-four years of his life he lived without any hint that he

1    was ever interested in any kind of child or that he was a

2    pedophile of any kind.

3         By the time that he finishes his sentence here -- and

4    we ask Your Honor to give a sentence of no more than 15 years,

5    the mandatory minimum -- he'll be 70 years old.  He won't be a

6    danger to others at that point, and he will have learned his

7    lesson, which is rather stark for an individual who, as Your

8    Honor noted, has a criminal history category of one.

9         There's no indication in his background or his history

10   that he had any propensity to do anything like this.  He never

11   did anything like this before.  None of these pictures were

12   ever shared, distributed, taken to a chat room, put on the

13   Internet.  Nothing like that ever happened.

14        So the question really has to become, you know, why

15   now?  Why, at age 54, does this suddenly happen?  The

16   evaluation from Dr. Dattilio that was provided in the

17   presentence report objections, I believe, or it might have been

18   a conclusion with the exhibits to the sentencing memorandum,

19   indicated that he's only a moderate risk to reoffend.

20        But Dr. Dattilio could not answer the question as to

21   why, as to why, suddenly, there would be this switch in this

22   man who, for his whole life, had been dedicated mostly to doing

23   good things for others, including his family.

24        It's an atypical switch, a change that just doesn't

25   seem to make sense.  Dr. Silverman has some answers for that.

1    He doesn't have a definitive answer, but he has some --

2    certainly some answers that help guide us in the right

3    direction.  And one of the significant answers is that his

4    brain has been suffering from a lack of oxygen for years as a

5    result of his sleep apnea.

6            Mr. Reed was just transferred yesterday from the

7    Columbia County Prison to the Dauphin County Prison, and the

8    prison allowed him to bring the CPAP machine with him from

9    Columbia County that he has just had -- well, I guess he's had

10   for about a year now.  Is that right?

11           *THE DEFENDANT:*  Um-hum.

12           *MR. THORNTON:*  Up to that point, he hadn't had a CPAP

13   machine, but we were lucky enough, through the work of

14   Dr. Silverman, to be able to get a CPAP machine into the

15   Columbia County Prison.

16           It's my understanding that the pictures were deleted

17   from the phone, that there was no distribution, no chatting, no

18   exchange, no intent to ever distribute.  And, consequently, we

19   suggest that that takes this case sort of out of the heartland

20   of production and enticement cases where the purpose and the

21   desire of the person doing it is to distribute it, to share it

22   with others.  We certainly don't have that.

23           This offense here is a combination of unfortunate

24   access and a failure of Mr. Reed to be able to control or

25   moderate his impulses.  It's a confluence of a situation that

1    is very unlikely to ever occur again where he would find

2    himself in a position where he would even be able to commit an

3    offense like this.

4            Your Honor, Mr. Reed, two of the charges here against

5    Mr. Reed are obstruction of justice charges, the last two

6    charges.  They obviously don't really drive the guidelines, but

7    they're important to this case.  And the obstruction of justice

8    charges really come from the fact that Mr. Reed didn't

9    understand what he was and was not allowed to do as a defendant

10   in a crime.

11           He's never really been a defendant other than a DUI

12   prosecution.  And he wrote letters to the mom -- or the

13   grandmother and was saying, you know, please, I didn't mean for

14   anything to go wrong here and please don't prosecute me.

15   Unfortunately, that turns out to be an obstruction of justice

16   letter.

17           And the situation we found ourselves with the U.S.

18   Attorney here, there were no deals to be made.  We asked

19   numerous times can we work anything out, and the answer was

20   absolutely not.

21           So we had to plead straight up to everything that

22   they -- all the charges they brought against him, and those are

23   two of the charges, though we don't think that those really

24   drive the guideline range or should drive Your Honor's decision

25   here because it wasn't a true attempt to obstruct in that he

```
 1    didn't threaten anybody or do anything like that.
 2            Your Honor, we do have some witnesses to present
 3    today.  We have Dr. Silverman, and we also have some family
 4    members.  I was going to put Dr. Silverman on last just so he
 5    could hear what the family members had to say.
 6            THE COURT:  Okay.
 7            MR. THORNTON:  First, we would call -- we just have
 8    Jay's sister, Your Honor, Jay's sister, Deb Dallmann.  Where
 9    would you like her?
10            THE COURT:  Do you wish to have the witness sworn?
11            MS. TAYLOR:  No, Your Honor, that's not necessary.
12            THE COURT:  Okay.  Right here is good.
13            MR. THORNTON:  Could you tell us your name, please?
14            MS. DALLMANN:  Deborah Dallmann.
15            THE COURT:  Good afternoon.
16            MS. DALLMANN:  Good afternoon.
17            MR. THORNTON:  And, Ms. Dallmann, you wrote a letter
18    that's included in my sentencing memorandum.  Is that right?
19            MS. DALLMANN:  Yes, I did.
20            MR. THORNTON:  And I know Judge Kane has had a chance
21    to see that letter.
22            THE COURT:  It was a long letter.
23            MS. DALLMANN:  Yes, it was.  It came from the heart.
24            MR. THORNTON:  And I assume Your Honor also had a
25    chance to see the video that we put together from the family.
```

1          *THE COURT:*  I did, I did.  Your parents look like good

2     people who are not in the greatest of health at this point.

3          *MS. DALLMANN:*  No.  My dad is here today.

4          *MR. THORNTON:*  Jay's father was able to come today.

5          *THE COURT:*  Oh, good.  Okay.

6          *MR. THORNTON:*  But he's not going to add anything

7     today.  Deb, could you just tell us a little bit about

8     yourself?  Where do you work?

9          *MS. DALLMANN:*  I'm an attorney with the Legal Aid

10    Society of Cleveland.  I live in Cleveland.

11         *MR. THORNTON:*  And you have something to say to the

12    judge?

13         *MS. DALLMANN:*  I did kind of abbreviate what I wrote

14    to you, but I guess I should try to just make it brief, make it

15    short.

16         As I said in my memo, my letter to you, I struggle

17    with that, and I tried to think of a way to describe the

18    character of my brother, the brother that I know for 50-some

19    years, my brother.

20         And when you look at him today with the harshness of

21    three years of county jail across his face, I want you to see,

22    this is my brother *(displaying photograph)* with the easy smile

23    and the sparkle in his eyes and who was always compassionate

24    and caring, always.

25         He always helped.  He helped me in many ways.  I

1    suffer from anxiety attacks where I can't drive.  He was a

2    long-haul truck driver, and he was the only one that ever truly

3    understood what I was going through.  And he never judged.  He

4    gave me strength.

5         And he was always there to help my mom and dad.  And

6    as they age, he writes from his cell -- dad had a back

7    operation, and he writes from his cell, If I was there, Dad, I

8    would help you.  And I know that he would because that is the

9    brother that I know.  That is the kind, caring, compassionate

10   brother.

11        He sometimes didn't make the best financial decisions.

12   Him and his ex-wife rescued cats for many, many years, and I

13   recall one -- and this goes to his heart, in my mind.  It was a

14   rainy night in Texas, a truck stop, a poor little abandoned

15   kitten, and what does he do?  He takes it, even though, even

16   though he's not allowed to have it in his truck.  And he names

17   her Angel as a tribute to the God that he knew led him to

18   rescue that cat.

19        And that goes to our background, our foundation, how

20   we were raised.  My grandmother was a Christian, and she taught

21   us from day one to do right and to love the Lord and to be

22   faithful to God's words.  And I know, I know my brother at

23   heart is that Christian, and he has rededicated his life to God

24   since in prison, even though he's been denied religious

25   services in prison.

1          And he always thinks of others, even now.  He never

2    complains.  He has not complained once to me, because, you

3    know, when he calls me, he says, How's my sissy today?  How's

4    my favorite sister?  Not complaining at all.

5          And he's helped other inmates.  And what does that --

6    what happens to him when he helps inmates?  He's vulnerable,

7    but yet he still does it.

8          When first housed at Dauphin County, his celly had

9    only one pair of underwear, and Jay watched him wash that same

10   pair of underwear every other day.  What did Jay do?  He bought

11   him some, handed it to him quietly, without a word, because he

12   knew that that celly was vulnerable and needed help.  And that

13   spoke to his heart.

14         And even now at Columbia, they were housed in the gym

15   for a number of months, then rehoused someplace else, and then

16   back into the gym.  There were no bathroom facilities in that

17   gym.  They had to call COs to come, come escort us, and the COs

18   would often wait.  And Jay said, Oh, it's not too bad, if you

19   lay down, if you lay down, the pain kind of goes away.  He

20   never complained about himself.

21         What did he complain about?  The one inmate Pappy, 70

22   years old, who couldn't hold it and who urinated on himself.

23   And what was Jay's remark?  You know, it was for Pappy.  He was

24   always concerned, kind, caring, compassionate for others.

25         And even when he was initially housed at Centre County

1   in August, at classification, there again they asked him where

2   he wanted to be housed, and he said, Well, I'd like to come in

3   with the old guy that I came in with so I can help him, he's

4   slow, he doesn't understand.

5        And I apologize, Your Honor, I just wanted to make

6   sure that I relayed to you the things that I see --

7        THE COURT:  Of course.

8        MS. DALLMANN:  -- and how I've grown up with my

9   brother and what his true spirit is.

10        And I know my mom and dad did a video for you, and my

11   dad is here today.  He's not going to be able to say anything,

12   but he wants you to know that he loves Jay very, very much.

13        And I recall, I recall early on my mom telling me

14   something that my dad said to her.  He said, I wish they would

15   sentence me instead, I've lived my life, let them take me

16   instead.  And I think that with my parents, the way they raised

17   us, that really speaks to how my parents have instilled

18   compassion and generosity and that spirit in all of us, and it

19   is in Jay.

20        He recently -- even in prison, where he's very, very

21   vulnerable for so many reasons, he still tries to help others.

22   And just a couple little examples.  He had a cellmate Jesse,

23   who's a young African-American who lived a life of crime.  Jay

24   ordered him Our Daily Bread, the religious pamphlets, and

25   shared with him his Bible.  And for some reason this odd

pairing stuck.  And Jesse writes me and he says, I will love

Jay forever for showing me the Lord.

And then there's a cellmate David, who I think had

some severe intellectual disabilities.  He stole from inmates

at Columbia County, and he got beaten up for it, harassed and

probably even sexually harassed.  When he would steal from Jay,

what did he do?  He said, Now, David, he says, you know you

have to ask me, right?  And he was tolerant of it, but he tried

to help him.

And I know that these aren't examples of bravery or

heroism and maybe they aren't that good, but it's kind of hard

to go back through the years and think of things when that

person always had a good and generous and compassionate spirit

and you probably took it for granted.

So I realize that what I wrote in the memo probably

begs the question, what happened?  How did he get to who he is

now?  It's certainly difficult to reconcile the person that

I've described with these offenses that he's pled guilty, and I

can only speculate.  But several years ago, we did notice a

change in his normally good judgment, and common sense seemed

to dissipate.

He ended up ending his marriage, making rash

decisions, changing a relationship, and there was a perceptible

change we couldn't explain.  Looking back, I realize that was

also the time that his health had dramatically declined.  He

1    suffered a stroke when driving in Arizona one year, gained a

2    lot of weight, high blood pressure, uncontrolled diabetes, and

3    severe sleep apnea.

4         He ignored his health, of course, until he could no

5    longer drive.  I wish that I would have been more persistent in

6    my questioning of my brother.  I'm sorry that I may have missed

7    something that could not have -- that maybe could have helped

8    him.  And just as I am sorry for what I know that my brother is

9    truly, truly remorseful for, Your Honor -- just as I am sorry,

10   he is, as well.

11        And you may look around the courtroom today and wonder

12   if Jay was such a good and helpful person as I described, where

13   are his friends?  Where's the rest of the family?

14        My mom is ill and my brothers -- she's also written a

15   statement, and they both love Jay very, very much.  And my

16   other brothers love him, as well.  And my sister has provided a

17   statement for you, too, and they cannot be here today.  And

18   I've also spoken to many of his colleagues, and they can't be

19   here today, either.

20        But I ask that you do not attribute their absence to a

21   lack of not being supportive of Jay, of not finding him to be a

22   good and caring colleague and person.  They relayed stories to

23   me of how Jay was always a good friend and always there for

24   them.

25        Their absence may, perhaps, speak to their lack of

1  strength or perhaps it's their desire to remember their good

2  friend as they last saw him, on some lonely stretch of

3  interstate in their rearview mirror and knowing that he always

4  had their back.

5       Over the past two years I cannot help but hear news

6  and reports of arrests and convictions, each more unbelievable

7  than the other.  Unlike my brother, in many cases, the

8  defendants have all lived a lifetime abusing the vulnerable and

9  yet have been sentenced to less time than is being recommended

10 for Jay.

11      I ask for leniency, Your Honor, as you consider just

12 punishment for my brother.  At his age and with his poor

13 health, I fear this time will kill my brother.  The

14 compassionate nature that I admire and describe will mean only

15 one thing in prison: vulnerability and easy prey.

16      This is the hardest thing I have done in my life.  But

17 I promise you, Your Honor, that my brother will always have my

18 support, and I will help him in any way that I can.  And on

19 behalf of my family, I humbly, I humbly and respectfully ask

20 Your Honor to consider the entirety of this man, this man

21 *(displaying photograph)*, as you sentence my brother today.

22      *THE COURT:*  Thank you.

23      *MS. DALLMANN:*  Thank you.

24      *MR. THORNTON:*  Your Honor, our next witness will be

25 Dr. Silverman.

1    *THE COURT:* All right.  Thank you.

2    *JOSEPH SILVERMAN, M.D., called as a witness, having been*

3    *duly sworn or affirmed, testified as follows:*

4    *COURTROOM DEPUTY:* Please state your name for the

5    court reporter.

6    *THE WITNESS:* My name is Joseph Silverman.

7                         DIRECT EXAMINATION

8    BY MR. THORNTON:

9    Q.  Dr. Silverman, where are you from?  Where do you live?

10   A.  I live in Blair County.  I was born there, and I practiced

11   medicine there for over 50 years.

12   Q.  Over 50 years?

13   A.  Over 50 years there.

14   Q.  And you currently live in Hollidaysburg.  Is that right?

15   A.  Which is a suburb.

16   Q.  At this point, what is your occupation right now?

17   A.  I have not yet retired, but I'm a general psychiatrist

18   who's done a bit of everything in psychiatry from military,

19   child, forensic, and general outpatient treatment.

20   Q.  And can you tell us the percentage of your practice that

21   was general psychiatry versus forensic psychiatry?

22   A.  Well, for all those years, it was primarily a general

23   psychiatric practice, treating people with depression,

24   schizophrenia, obsessive-compulsive disorder, and so forth.

25   But for the last eight years, after leaving the Veterans

Direct/Thornton - Dr. Silverman

1  Administration, where I took care of veterans for 45 years,

2  I've been doing court cases only, criminal fundamentally.

3  Q.  Can you tell us a little bit about your education and your

4  work history?

5  A.  I am a graduate of Mercersburg Academy, Cornell University,

6  University of Pittsburgh School of Medicine.  I did a general

7  medical internship at West Penn Hospital in Pittsburgh.  My

8  psychiatric training was at Western Psychiatric Institute and

9  Clinic.  And I am a fellow of the American Psychiatric

10  Association, actually a distinguished life fellow based on

11  experience and achievements.

12  Q.  Do you hold any or have you held any faculty positions,

13  teaching positions in your career?

14  A.  I have done teaching for Altoona Hospital, Hershey Medical

15  Center, University of Pittsburgh.

16  Q.  And have you written any professional journals --

17  professional publications or books or articles in professional

18  journals?

19  A.  Never a book, but a number of articles.

20  Q.  And, specifically, was there an article that you wrote in

21  the Cortlandt, C-o-r-t-l-a-n-d-t?

22  A.  Cortlandt Forum, which is a medical journal for family

23  practitioners, and they arranged for me to write a column on

24  psychiatry every month for several years.

25  Q.  And was one of the columns that you wrote on -- was it on

Direct/Thornton - Dr. Silverman

1   personality changes in dementia in 1992?

2   A.   Yes.

3   Q.   So is this -- regarding personality changes in dementia, is

4   that something that you've been interested in and following for

5   years?

6   A.   Absolutely.

7   Q.   And the Psychiatric Annals, have you also written for them?

8   A.   Yes, recently, actually in 2014, I -- with the editor of a

9   symposium on psychiatry and society.  The article that I wrote

10  with Dr. Eisler had to do with criminal justice, and the title

11  was, Criminal Injustice.

12  Q.   Are any of the publications or writings that you've done,

13  have they involved sex offenders of any type?

14  A.   I don't recall writing any articles on sex offenses, but

15  I've certainly seen a number of clients who were accused of

16  sexual crimes.

17  Q.   And have you been admitted as an expert in other courts?

18  A.   Yes, throughout Pennsylvania.

19  Q.   And, specifically, can you name a couple of them, a couple

20  counties?

21  A.   Blair County, Huntingdon County, Centre County, Cambria

22  County, Somerset County, and Jefferson County.

23  Q.   And was that an expert in the field of general psychiatry?

24  A.   That was all forensic.

25  Q.   That was all forensic psychiatry.  Have you testified on

Direct/Thornton - Dr. Silverman

1    behalf of the government and on behalf of defendants?

2    A.  I have.

3    Q.  Do you know which one you've testified more on?

4    A.  Oh, certainly.  Defense attorneys were more interested in

5    psychiatric input than DAs, but there were a few DAs who

6    solicited my opinion, too, and judges.

7         MR. THORNTON:  Your Honor, we would offer

8    Dr. Silverman as an expert in general psychiatry.

9         THE COURT:  Any objection?

10        MS. TAYLOR:  No objection, Your Honor, and no

11   questions as to qualifications.

12        THE COURT:  All right.  Dr. Silverman will be

13   qualified as an expert in psychiatry and permitted to offer his

14   opinions accordingly.

15        MR. THORNTON:  Thank you.

16   BY MR. THORNTON:

17   Q.  And the opinions you offer, Dr. Silverman, will they be to

18   a reasonable degree of medical and psychological certainty?

19   A.  Those that I will state today will be within those

20   parameters.  And typically when I submit reports to attorneys

21   and courts, they are also with reasonable medical certainty.

22   Q.  Thank you.  If I could have the court's indulgence for one

23   second, Your Honor.  Dr. Silverman, did you at one point have

24   an occasion to interview Jay Reed?

25   A.  I did.

Direct/Thornton - Dr. Silverman

1      *MR. THORNTON:*  And, Your Honor, we have, from the

2  exhibit list from our sentencing memorandum, the Exhibit

3  Numbers 2, 3, 4, and 5 will be what Dr. Silverman discusses.

4  BY MR. THORNTON:

5  Q.  And did you visit Mr. Reed as a result of being hired by

6  the Federal Public Defender?

7  A.  May I have that question again?

8  Q.  Sure.  Did you go to see Mr. Reed as a result of being

9  hired by the Federal Public Defender's Office?

10  A.  That is correct.

11  Q.  And where did you see Mr. Reed?

12  A.  That interview took place in Bloomsburg, Pennsylvania,

13  where he was in a county court -- a county jail.

14  Q.  Do you have copies of your reports there, or should I

15  provide you with them?

16  A.  I have them now.

17  Q.  Okay.  If we could, did you conduct a psychiatric

18  evaluation of him on June 23rd, 2017?

19  A.  I did.

20  Q.  And what did you see your role as the psychiatric expert in

21  this matter at that point?

22  A.  Well, my job was, of course, to understand the individual

23  and to try to assess how it was that he had apparently,

24  allegedly -- and I think subsequently he agreed to it --

25  committed these crimes against a number of children.

Direct/Thornton - Dr. Silverman

1    Q.  And when you went to that prison, did we provide you with

2    the report of Dr. Dattilio who had done examinations of

3    Mr. Reed?

4    A.  Yes, I had reviewed that ahead of time.

5    Q.  And did you -- after reviewing Dr. Dattilio's report, did

6    you see alternative explanations to the conduct other than what

7    Dr. Dattilio found?

8    A.  Yes, I believed that there was reason to look into the case

9    a bit further from the standpoint of a psychiatrist as opposed

10   to a psychologist with reference to his overall mental status

11   and problems with that.

12   Q.  And what different perspectives does a psychiatrist bring

13   rather than a psychologist?

14   A.  Well, psychiatrists deal with some cases a lot more than

15   psychologists do, and we also treat, which psychologists don't

16   treat with regard to certain cases.  There's an overlap where

17   psychotherapy might be the treatment, but psychiatrists do

18   chemical treatment and other organic treatments for brain

19   disorders.

20   Q.  And psychologists generally then do not -- well, like you

21   said, they do not treat brain disorders or diagnose brain

22   disorders?

23   A.  They're welcome to diagnose according to their criteria and

24   their tests, but they have a different perspective.

25   Q.  And what difference would -- well, the different

Direct/Thornton - Dr. Silverman

1  perspective that you brought to this case than Dr. Dattilio,

2  what type of things were you looking for as opposed to what he

3  was looking for?

4  A.   I was looking for changes in brain functioning,

5  particularly personality changes, behavioral changes.

6  Dr. Dattilio was really exploring in detail the sexual

7  orientation of the defendant, where I was looking primarily at

8  his mental status and attempting to see if there was a reason

9  for his unusual behavior.  After having been heterosexual for

10 50 years or more, to have a sexual interest in children did

11 suggest that there was a change in the brain which led to that

12 change in behavior.

13 Q.   And during your report, did you note symptoms that

14 supported your hypothesis?

15 A.   I drew the conclusion that the defendant did have dementia

16 related to poor memory and poor judgment.  But I should point

17 out that from the medical standpoint, pedophilic behavior in

18 later life is a brain disorder, often temporal lobe, and it

19 requires diagnosis and treatment.

20 Q.   And what type of treatment can be -- if it's a brain

21 disorder of the temporal lobe, what type of treatment can be

22 had for that?

23 A.   Difficult to say in general, but it could range from

24 medication that improves cognition and intellectual function,

25 could be antidepressants, which in some cases change sexual

Direct/Thornton - Dr. Silverman

1   behavior.  There might be other treatments depending on what is
2   found.
3          I was looking, of course, for abnormalities in the
4   thyroid, B12 serology, which means brain syphilis.  I was
5   looking for all those things.  And some of those tests were
6   performed, some of them.  Very few were not.
7   Q.  Now, did you suggest a test, some tests to be performed
8   specifically?
9   A.  I did, I did.  He had had a CT scan, but I suggested an MRI
10  scan, which is more precise in brain disorders.
11         With both of those showing nothing specific, there
12  would be a routine of subjecting the defendant to a PET exam,
13  P-E-T, positron tomography, because different disorders,
14  different abnormalities show in different ways on different
15  scans, and plenty of things don't show on any scan.  But one
16  wants to see what's there, and if there's anything treatable,
17  like, for example, a brain tumor or an infection, then a
18  specific treatment could be effective.
19  Q.  Now, if I could take you to Page 3 of your psychiatric
20  evaluation, which is Exhibit Number 2 to the sentencing
21  memorandum, and on Page 3, you have what's entitled an opinion
22  section.
23         And in there you list your mental diagnoses as
24  neurocognitive disorder, moderate, with impairment of memory
25  and higher brain functions by capacity for abstract thinking.

Direct/Thornton - Dr. Silverman

1   What brought you to that conclusion?

2   A.   What was the --

3   Q.   What brought you to that conclusion?

4   A.   First of all, there was a history of change, a history of

5   impaired memory.  And at interview, this was very striking.

6   Practically the first thing the defendant said to me is, I

7   can't remember anything, I can't remember what I did yesterday,

8   my sister has to remember things for me.  Well, that was not a

9   very subtle clue, that was a very clear clue that there may

10  well be a brain change.

11       Then there were specific tests.  The storytelling

12  test, which is very simple, where you tell a story and ask for

13  recall of that story, and his performance was terrible.  And

14  that is indicative of -- right there of very poor function.

15  And also proverb interpretation showed a lot of organicity or

16  organic brain dysfunction.

17  Q.   And when you say "organic brain dysfunction," is that

18  something you're born with or is that something that develops?

19  A.   It could be either, but in this case, one assumes it was

20  developed subsequently and very likely correlating with the

21  behavior for which this gentleman has been charged.

22  Q.   And at the end of that number one there, you say that the

23  cause of the neurocognitive disorder and impairment of memory,

24  cause to be determined.  What did you do to try to determine

25  that cause?

Direct/Thornton - Dr. Silverman

1    A.  Well, I've already mentioned the various blood tests and

2    imaging that had been done.  Obviously one keeps doing more and

3    more as the initial tests don't find anything.  I did mention

4    that this PET scan would be the next imaging to be performed.

5         Anyhow, this is what one looks for because -- and

6    hopes for finding something that's treatable, and the

7    investigation has not yet been completed.

8    Q.  Did you determine whether or not his brain dysfunction

9    affected his judgment and self-control?

10   A.  That is my conclusion.

11   Q.  And I guess if we go to the final page of your initial

12   report, there you indicate your opinion on criminal

13   responsibility.  Could you explain that to us?

14   A.  I'll read this.  It says, At the time of the alleged crimes

15   Mr. Reed was laboring under the burden of a brain dysfunction

16   that had complex effects on his thinking, feelings, desires,

17   and capacity for self-control.

18        If I may go on, This defendant's newly developed

19   interest in immature females may have been a result of changes

20   in his brain consequent to a likely unrecognized pathologic

21   process.

22        This was the initial report from April, and

23   subsequently we have a bit better idea as to what might be

24   involved, including, of course, sleep apnea, which can cause

25   dementia right there, right in itself, and that we did

Direct/Thornton - Dr. Silverman

1   actually, as you know, arrange for treatment.  I don't know

2   that the treatment was monitored, but at least it was

3   administered.

4   Q.  And that was through the CPAP machine?

5   A.  The CPAP machine, right.  The point being that if you have

6   sleep apnea, you starve your brain of oxygen, and that does

7   damage after a time and can cause dementia.  Restarting

8   adequate oxygenation might relieve the damage but might not.

9   Q.  And at this point do you know whether the damage has been

10  relieved or not?

11  A.  As far as I can tell, there has not been major improvement.

12  Q.  And then on October 22nd, you issued an update on Jay Reed,

13  and this says, After lab studies review.  What lab studies had

14  you reviewed?

15  A.  I reviewed the serology, I reviewed the B12, and perhaps

16  some others, as well.

17  Q.  And what did the MRI reveal?

18  A.  The MRI revealed an abnormality in the brain which was

19  nonspecific, could be almost anything, but was not diagnostic

20  of anything.

21  Q.  And what do you mean by that exactly?

22  A.  In other words, one can't say because of that lesion, we

23  know that this is the problem.  All we can say is that lesion

24  may or may not be significant, and it may or may not be related

25  to the behavior of which the defendant is accused.

Direct/Thornton - Dr. Silverman

1   Q.  And you indicated, also, in the second paragraph, the lab

2   results reveal many abnormalities.  What were those other

3   abnormalities?

4   A.  Well, the gentleman has diabetes, and there are a number of

5   abnormal problems there, I believe also hypothyroidism and

6   other medical diagnoses which, I guess, were summarized under

7   diagnoses.  See if we missed any.

8         Panic disorder is, of course, a psychiatric problem.

9   History of substance disorder.  Okay, that's what I have.  And,

10  of course, attention deficit disorder did not require a lab

11  test.  I did administer tests for that, and that can be a

12  contributing factor to various problems.

13  Q.  And after doing the lab studies, in your October 22 report,

14  you came up with what you called a bottom line.  What did you

15  mean by that?

16  A.  May I ask what that reference was from?

17  Q.  Sure.

18        *MR. THORNTON:*  May I approach the witness, Your Honor?

19        *MS. TAYLOR:*  Your Honor, if I could just have an

20  exhibit number.

21        *THE COURT:*  Of course.

22        *THE WITNESS:*  Okay.  Thank you.

23        *MR. THORNTON:*  It's Exhibit --

24        *THE WITNESS:*  Okay.  This says --

25        *MR. THORNTON:*  Dr. Silverman, wait one second.

Direct/Thornton - Dr. Silverman

1          *THE WITNESS:*  Oh, sure.

2          *MR. THORNTON:*  It's Number 4.

3          *MS. TAYLOR:*  Okay.

4          *THE WITNESS:*  Bottom line, as of October 22, 2017, so

5    we've had a year beyond that, Mr. Reed's brain dysfunction is,

6    at present, unexplained, but whatever its nature and cause, it

7    may have induced the change in sexual interest and behavior

8    that led to criminal activity, activity the defendant has

9    formally acknowledged.

10   BY MR. THORNTON:

11   Q.  And when you say "formally acknowledged," did he indicate

12   remorse to you for the activity that occurred?

13   A.  I would not say remorse.  He said some of the charges,

14   even, perhaps, those that he even pled guilty to, he could not

15   acknowledge, but that there were some indiscretions that were

16   poor judgment on his part, which is probably not completely

17   candid, but that's what he told me at the time.

18   Q.  Now, from your examination -- and I know you did file one

19   last report, which would be Defendant's Sentencing Memorandum,

20   Exhibit Number 5.  I'd like to show you that from October 25th,

21   just a couple days later.  If you could just look that over.

22   A.  Okay.  This summarizes pretty much what I've said already,

23   I think, except that I did suggest that a neurologist become

24   involved because, after all, brain diseases are the property of

25   neurologists.  Psychiatrists deal with these things and we have

Direct/Thornton - Dr. Silverman

1   some neurologic training, but they have much more.  And is

2   there anything further?

3   Q.  No, unless you had something you wanted to bring up from

4   there.

5   A.  Well, I don't know if I've made this point today, but the

6   medical position on pedophilic behavior later in life is that

7   it is a brain dysfunction.  Before I did mention the temporal

8   lobe, but it's some sort of brain dysfunction.  So that -- to a

9   physician, that charge should have led to a neurologic

10  evaluation of the patient rather than -- in other words, a

11  medical approach rather than a penal approach.

12  Q.  What do you mean specifically by that?

13  A.  I beg your pardon?

14  Q.  What do you mean specifically by that?

15  A.  Well, that if in medical hands, the tests could have been

16  done in a week, and we would know what's knowable and what is

17  not.  But to plunge somebody into the penal system, punishing

18  him for behavior that, in my judgment, he had no culpability

19  for, seems very unfortunate.

20  Q.  And when you say that he had no culpability for the acts

21  that occurred here, how do you mean that?

22  A.  Well, people have little enough free will, very likely none

23  to start with, but here we have a -- in addition, we have a

24  brain disorder that very well may explain the behavior for

25  which he was charged.

1    Q.  But you cannot specifically say that that specific part of

2    his brain caused some specific action, can you?

3    A.  Can't be very specific, but I think there is, in my mind,

4    minimal doubt that the brain dysfunction was responsible for

5    his behavior.

6         MR. THORNTON:  Thank you.  We have no further

7    questions of Dr. Silverman, Your Honor.

8         THE COURT:  All right.  Ms. Taylor.

9         MS. TAYLOR:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11   BY MS. TAYLOR:

12   Q.  So, Dr. Silverman, if we could pick up actually where you

13   just left off, because I'm not sure I quite understood your

14   last responses.

15        You were explaining to Mr. Thornton that -- I believe

16   your last response had to do with you having an issue with

17   plunging the defendant into the penal system for issues that he

18   was not actually culpable for based on a brain disorder.  Is

19   that right?

20   A.  That's right.

21   Q.  And can you explain to the court exactly what you know

22   about the facts that underlie the charges in this case?

23   A.  I'm familiar with the charges, absolutely.

24   Q.  Okay.  So what is it that you don't think Mr. Reed is

25   culpable for?

Cross/Taylor - Dr. Silverman

1   A.  Well, let me just tell you, in the best of all possible

2   worlds, it would be understood by the state that an individual

3   who is accused of sexual behavior with immature females in

4   later life is a medical case by definition.

5   Q.  And when you say that, are you referring to everyone?

6   A.  That fits that description.

7   Q.  Okay.

8   A.  Because, you see, pedophilia, the fundamental, basic

9   run-of-the-mill pedophilia is a condition that manifests at

10  puberty and involves shy people who don't relate well to

11  adults.  If you have that kind of behavior later in life, it's

12  a different thing entirely.

13  Q.  Well, I saw that opinion -- you state that opinion in your

14  report.  Right?

15  A.  Yes.

16  Q.  And you had an opportunity to review Dr. Dattilio's report

17  that's Exhibit 1 attached to the defense's sentencing

18  memorandum?

19  A.  I did, I did.

20  Q.  And Dr. Dattilio has a different opinion as to whether the

21  defendant is a pedophile?

22  A.  I think that's right.  That was his opinion.

23  Q.  His opinion -- do you recall what his opinion was on that

24  topic?

25  A.  May I tell you, we do have a problem in psychiatry in that

Cross/Taylor - Dr. Silverman

1  some diagnoses are based on behavior.  So it doesn't mean that

2  this is the psychiatric status of the person, this is a

3  behavioral judgment.

4           So his behavioral observation, which the defendant

5  pled guilty to, is that he performed pedophilic behavior, but

6  it's a different kettle of fish than the standard pedophilia,

7  which is as I described.

8  Q.  And the definition that you're using for -- we're sort of

9  using two terms interchangeably.  Pedophilia and a pedophilic

10  disorder, those are two things that are distinguished by the

11  DSM-5.  Right?

12  A.  Well, I think in simple terms, you could have pedophilic

13  behavior without being a pedophile.  That's definitely right.

14  Q.  But you're aware that the DSM defines pedophilia

15  differently from a pedophilic disorder?

16  A.  May I tell you that my judgment is that the DSM-5 is very

17  poor on pedophilia.  Let me tell you, I was trained on DSM-1.

18  I've lived through all these five manifestations.  And I know

19  the people who were in charge of developing these different

20  forms, and they're all works in progress.  We need to do a lot

21  more work on that section.

22  Q.  So it sounds like you don't agree with the definition from

23  the DSM-5 of pedophilia?

24  A.  No, because it doesn't distinguish between the -- you might

25  say inherent pedophilia, which is a common thing, and the

Cross/Taylor - Dr. Silverman

1   pathologic onset of something many years beyond puberty, middle

2   life or beyond.

3   Q.  Well, you would agree with me that the way that the DSM-5

4   defines pedophilia currently is as an intense and recurrent

5   sexual interest in prepubescent children that becomes a

6   disorder if it causes a person marked distress or interpersonal

7   difficulty or if the person acts on his or her interests?

8   A.  Well, that's the general definition, but we've got to get

9   it down to distinguishing between the two, the inherent and the

10  late life, because the late life is a neurologic disorder.  We

11  don't know anything about really the nature of the inherent

12  pedophilia.

13  Q.  But isn't it true that you also don't know that what

14  happened with Mr. Reed, the defendant in this case, only

15  happened late in life?

16  A.  Yes, that's exactly the point, that it's a different

17  disorder completely than the inherent form.

18  Q.  No, I'm sorry, I think maybe you misunderstood my question.

19  A.  Oh.

20  Q.  Let me rephrase it.  All that the government can prove is

21  that the defendant was caught late in life.  Right?  That's all

22  that the case is that's before the court?

23  A.  Right, but our history is that he was definitely

24  heterosexual for all those years prior to that.

25  Q.  And the history that you're referring to, what's that based

Cross/Taylor - Dr. Silverman

1   on?

2   A.  Based on history, based on the history that we have, which

3   is pretty detailed.  Dr. Dattilio did a very detailed history.

4   Q.  I'm sorry?

5   A.  Dr. Dattilio's history was very detailed on that count.

6   Q.  And Dr. Dattilio's history, do you recall what his history

7   was based on, where that came from?

8   A.  Based on, where that came from?

9   Q.  Yes, sir.

10  A.  Could you help me with that?

11  Q.  It was self-reported by Mr. Reed is what I'm getting at.

12  A.  Oh, yes, yes, yes, sure, sure.

13  Q.  So in Defense Exhibit 1 -- I'm sorry, sir, do you have a

14  copy of Dr. Dattilio's report?

15  A.  I do here.  I have one here, I think.  I'm sure I do.

16  Yeah, right here.

17  Q.  So that's -- Defense Exhibit 1 is Dr. Dattilio's report.

18  And you mentioned the history that's in Dr. Dattilio's report

19  as being rather detailed.  And on Pages 3 through 13 of Defense

20  Exhibit 1, that makes up the detailed history in Mr. Reed's

21  case from Dr. Dattilio's report.  Right?

22  A.  Sure.

23  Q.  And it is incredibly detailed?

24  A.  Um-hum, right.  I have to say, Dr. Dattilio, who is, I'm

25  sure, a superb psychologist, he really missed it on this one.

Cross/Taylor - Dr. Silverman

1    Q.  Well, my question to you, though, about Dr. Dattilio's --
2    the history that's self-reported by Mr. Reed is, doesn't that
3    very detailed history that Mr. Reed gave Dr. Dattilio, doesn't
4    that conflict with your opinion, sir, about Mr. Reed having
5    severe memory problems that lead to this generalized brain
6    dysfunction diagnosis that you've opined?
7    A.  Let me see.  Dr. Dattilio acknowledges, actually, that it's
8    a late-life pedophilic behavior or inappropriate sexual
9    behavior.  So we don't disagree on that.  The only thing is, he
10   didn't seriously consider that this was a brain disease.
11   Q.  Right, I'm not -- I understand Dr. Dattilio didn't address
12   that particular issue.  But your opinion from -- that you've
13   opined about earlier that's in your report talked about brain
14   dysfunction that's unexplained and that's a neurocognitive
15   disorder on Page 3 of your report, Exhibit 2, Defense Exhibit
16   2.
17   A.  Um-hum, sure.
18   Q.  And you talked about that that was based on the defendant's
19   self-report from your interview with him that he couldn't
20   remember things.  He said his sister had to remember things for
21   him.  And then you talked about giving him the storytelling
22   test.
23       But isn't that in direct conflict with what we see in
24   Dr. Dattilio's report if you look at that very detailed history
25   on Pages 3 through 13 of Defense Exhibit 1?

Cross/Taylor - Dr. Silverman

1   A.   Well, I think it's compatible.  Could you point to

2   something?  Because I think we do agree he was heterosexual in

3   a normal, normative fashion.

4   Q.   Sir, I'm not asking about any specifics, just that very

5   simply, you say Mr. Reed told you he couldn't remember anything

6   when you see him on June 23rd of 2017, and when he talks with

7   Dr. Dattilio on June 27th of 2016, Dr. Dattilio produces, you

8   know, ten pages of a very detailed personal history that

9   Mr. Reed provided him.

10  A.   Sure, which I agree to.  I have no reason to doubt it.

11        *MR. THORNTON:*  Your Honor, we would object as to the

12  foundation for the question.  Ms. Taylor has failed to note

13  that Dr. Dattilio also spoke with Deborah Dallmann on

14  April 3rd -- I mean on November 3rd, 2016, before his report

15  was written and with Carol Morrison on November 8th, 2016,

16  before his report was written.

17        So Ms. Taylor's conclusion that this was all Jay's

18  recollection seems to not be absolutely accurate.  It seems to

19  need correction.

20        *MS. TAYLOR:*  Well, Your Honor, on Page 3, at the

21  beginning of the history, the portion that I've referenced for

22  Dr. Silverman, at the bottom of the page it states it was on

23  June 27th, 2016, that Mr. Reed provided me with the following

24  rendition of his life, and then that's the portion that I've

25  referenced starting at the bottom of Page 3 and then ending on

Cross/Taylor - Dr. Silverman

1   Page 10.

2          *THE COURT:*  All right.

3          *THE WITNESS:*  Yes, I agree to the history, but

4   Dr. Dattilio -- let me say in general, we have not done a great

5   job at understanding pedophilic behavior, whether the standard

6   inherent type, the common type, or the late-life type.

7          But the late-life type is medically understood now as

8   a brain dysfunction, and Dr. Dattilio was not aware of that,

9   apparently.  It's a confusing area, and I don't blame him.  I

10  know he's an excellent psychologist, but that is a point that

11  he overlooked.

12  BY MS. TAYLOR:

13  Q.  Now, sir, your evaluation was based on your interview with

14  Mr. Reed.  Correct?

15  A.  Correct, and talking with family members and so forth.

16  Q.  Well, on your report it indicates that it was based on your

17  interview of Mr. Reed, your review of Dr. Dattilio's

18  assessment, the presentence report, which you have listed as

19  Document 46, and communicating with Mr. Reed's sister, Deb

20  Dallmann.

21  A.  And other family members, too, an ex-wife and so forth.  If

22  they're not listed, that's my shortcoming.

23  Q.  Okay.  Well, if you look at your report, Defense Exhibit 2,

24  the final page, you list at the bottom the sources of

25  information.  Correct?

Cross/Taylor - Dr. Silverman

1   A.   Right, that is true.  And I typically -- of course, I

2   allude to that, I guess, earlier, but I would ordinarily

3   indicate the family members that I interview by telephone.

4   Q.   And on that list is the four things that I stated, and the

5   fourth is Ms. Dallmann, Mr. Reed's sister, but you don't have

6   any other family members listed.  Right?

7   A.   You're correct, and that is my shortcoming.

8   Q.   Now, Dr. Dattilio administered a number of different tests

9   that he reported on in his report?

10  A.   That's correct.

11  Q.   Did you repeat any of those tests?

12  A.   The storytelling test is the one I repeated because I

13  couldn't believe that that score was roughly normal, the score

14  he reported for the storytelling test in the MMSE, second

15  version, because the test -- his memory for the anecdote that I

16  read to him was terrible, and that is virtually diagnostic of

17  brain dysfunction.

18  Q.   You didn't repeat the Hare psychopathy checklist?

19  A.   Oh, no, no, no.

20  Q.   But you reviewed the score that Dr. Dattilio gave Mr. Reed,

21  a 17 out of 30.  Right?

22  A.   A 17 out of 30 on the storytelling, was it?

23  Q.   On the Hare.

24  A.   On the Hare.  I didn't review that.  Obviously that score

25  is not indicative of psychopathy, but it does have some

Cross/Taylor - Dr. Silverman

1    similarities with sociopathy.

2            May I say, the fundamental issue in sociopathy -- good

3    to look at you, Your Honor -- the fundamental issue in

4    sociopathy is lack of empathy.  Unfortunately, it is largely

5    inherited, that lack of empathy, but with that lack of empathy,

6    you just don't feel for other people.  You just don't have that

7    warmth.  You may use other people as objects, manipulate them.

8            But this man has a history of being warm and

9    supportive in many relationships, which is virtually the

10   negation of sociopathy.  So I take sociopathy right out of the

11   picture.

12   Q.  Well, sir, you saw how Dr. Dattilio scored him on the Hare.

13   Right?

14   A.  May I have that again?

15   Q.  You saw what Dr. Dattilio had to say about how he scored

16   him on the Hare?

17   A.  Yes, I did.

18   Q.  And that the score of 17 places him in a higher percentile

19   rank, suggesting that there are some antisocial traits and

20   propensity towards sexually violent predatory acts?

21   A.  Well, that's what sociopathy is.  And he thought there were

22   some indicators of that but not diagnostic.  I think it was a

23   sub-diagnostic level that he reported, and I did not see that

24   as being significant, particularly with the history as I

25   pointed out of warm, helpful relationships with other people.

Cross/Taylor - Dr. Silverman

1  Q.  What about his relationships with the four victims in this
2  case?
3  A.  You know, this surprises people, but I've talked to other
4  people who have been involved with underage partners, and very
5  often I believe that they are genuinely fond of the children,
6  generally fond of the children.
7          But they demonstrate a phenomenon that is in the
8  literature and makes very good sense to me, and that is that
9  there is a failure to limit affection for children to
10 nonsexual, nonacting out behavior, that there's something about
11 the caring that gets carried away.
12         And I can believe that this happened in his case, as
13 it does in a variety of other cases.  It's not that they hate
14 the children, it's just that there's something that clicks in
15 their brain and that becomes sexualized, whereas for most
16 people, they're just children and they're not sexual objects.
17 Q.  But according to your report, when you asked Mr. Reed about
18 the photographing of the young victims in this case, that's not
19 what he told you.  Right?  He didn't give you an answer about
20 having sexualized the children?
21 A.  Well, may I say, this phenomenon that I've described, which
22 is not unique with me, I've seen this in the literature and I
23 agree with it, we didn't -- I didn't talk to Mr. Reed about
24 that, of course, because that would be at a level that he
25 wouldn't understand, and that wouldn't have been part of our

Cross/Taylor - Dr. Silverman

1   conversation.

2   Q.  Did you ask him if he took pictures of the little girls in

3   this case?

4   A.  Yes, he admitted that.

5   Q.  And he told you, he gave you a reason as to why he did it.

6   Right?

7   A.  Yes, that story about showing the girls how dirty they were

8   after playing outside and so forth.  That was his explanation.

9   It did not strike me as terribly valid, but that was what he

10  told me.

11  Q.  And you also asked him if he thought that he had done any

12  harm to the victims in taking those types of images of them?

13  A.  Yes, that's right.  He said at first he couldn't see any

14  harm, but then in a general way, he acknowledged that it could

15  have been harmful.  He wasn't very precise about that.  Maybe

16  that's a little more complicated than he can handle or maybe it

17  was hard for him to be totally frank.

18  Q.  But then after he acknowledged he could have done some harm

19  to them, he had another comment about harm, right, that you

20  documented in your report?

21  A.  Harm?  Do you want to quote it so I know?

22  Q.  In a later -- in Exhibit 2, Defense Exhibit 2, your report

23  on the bottom of Page 2, you indicated, In a later comment,

24  Mr. Reed did acknowledge that there could have been some harm

25  to the children, though mainly he felt that the major harm was

Cross/Taylor - Dr. Silverman

1    legal peril to the photographer rather than adverse

2    psychological effects --

3    A.  Right.

4    Q.  -- upon the girls.

5    A.  Right, right.  Again, that does not reflect a profound

6    understanding of why it's harmful.  We know it's harmful

7    because it exposes young children to sex at a level that is not

8    appropriate for them, that confuses them, but I think that's

9    too complicated for him to understand.

10   Q.  Well, Mr. Thornton asked you some questions about whether

11   he -- Mr. Reed was remorseful to you, and that's something

12   that, you know, I think the judge will be considering in

13   imposing her sentence.  And you had indicated that, no,

14   Mr. Reed did not express remorse to you.  That type of comment

15   would suggest he was not remorseful.

16   A.  Well, of course, he's in denial of some of the behavior.

17   Q.  What behavior is that that you're referring to?

18   A.  I believe -- he was not very specific, but he did indicate

19   that there were some things he was charged with that he could

20   not acknowledge.  I assume the physical contact.

21   Q.  Would it change any of the opinions that are in your report

22   here today if you learned that in May of this year, he actually

23   did plead guilty to the local charges of rape of the minor

24   victims that are the same minor victims in this case?

25   A.  I'm aware that he finally did agree to accept that.  He did

Cross/Taylor - Dr. Silverman

1  agree to it in general and in specific but without being

2  questioned specifically.

3  Q.  So would the fact --

4  A.  I should point out, people with brain damage can't think at

5  a high abstract level.  That was the implication of the

6  diagnosis.

7  Q.  Well --

8  A.  See, remorse requires a certain abstract conclusion from

9  things.  I don't think he's able to do that.

10  Q.  But my question was, would the fact that he pled guilty to

11  the rape, the rape charges of those minor victims that are the

12  same minor victims in this case, would that change any of your

13  opinions in your report?

14  A.  No.  I'm sure he accepted counsel's recommendation that he

15  agree to that, and there's no reason why he shouldn't do that.

16  But it was just too painful for him, I think, to admit to

17  specific things.

18  Q.  So you stand by your opinion that he's not a pedophile?

19  A.  Well, to make clear, I think he demonstrated pedophilic

20  behavior.

21  Q.  That's not what you said in your report, sir.

22  A.  Well, I'm happy to make it more clear for you now.  But the

23  point is, he is a victim of a brain disorder, and it should not

24  be confused with inherent pedophilia.

25  Q.  The report that the defense submitted to the court, Exhibit

Cross/Taylor - Dr. Silverman

1   2 on Page 4, in the middle of that page, the sentence says, It
2   is clear that Mr. Reed is not a pedophile.  Is that not your
3   opinion, sir, now?
4   A.  Let me take a look at that.  Is not a pedophile, okay.
5   Actually, we are quibbling about definitions.  I think it's
6   better if we leave it as I've said, that we have a
7   differentiation between inherent pedophilia and late-life
8   pedophilia.  Late-life pedophilia is a brain disease.  So I
9   think when I wrote that, I was thinking that it's important to
10  distinguish his behavior from inherent pedophilia.
11         I still believe it is necessary to distinguish
12  late-life pedophilic behavior, which is the result of a brain
13  disease, from the inherent pedophilia.
14  Q.  In coming up with that conclusion, sir, you haven't had an
15  opportunity to view any of the forensic evidence that was taken
16  from Mr. Reed's devices in this case, any of the images.
17  Right?
18  A.  Actually, I did not look at that.
19  Q.  Okay.  I'm going to show you what's been marked as
20  Government's Exhibit 7.
21         *MS. TAYLOR:*  And, Your Honor, what this is is just a
22  printout of -- I believe it's ten, only ten images of the
23  roughly 500 that were taken off of Mr. Reed's devices.  Last
24  week we had an opportunity to invite Mr. Thornton over.  He had
25  a chance to review them at that time with an agent from the FBI

Cross/Taylor - Dr. Silverman

1   and myself.  I believe he had a chance to take a look at them

2   again this afternoon before we started the hearing.  May I

3   approach the witness?

4            THE COURT:  Yes.  Was it 500 images or 300?

5            MS. TAYLOR:  There were 500 total.  Two hundred were

6   of the hands-on victims in the case, and then 300 were of

7   commercially downloaded child pornography.

8            THE COURT:  Thank you.

9   BY MS. TAYLOR:

10  Q.  Sir, I'm going to hand you a notebook that's marked as

11  Government's Exhibit 7.

12  A.  Okay.  May I tell you, Your Honor, this is a very important

13  point.  I've been down this road in many a case.  Things like

14  this are inflammatory and interfere with an objective

15  scientific evaluation.

16           THE COURT:  Your objective scientific evaluation?

17           THE WITNESS:  I beg your pardon?

18           THE COURT:  Are you saying that you can't objectively

19  evaluate this after seeing the images?

20           THE WITNESS:  No, no, I'm saying that this kind of

21  evidence is often presented to inflame people and to cause them

22  to use less judgment and more emotion.

23  BY MS. TAYLOR:

24  Q.  Are you saying the court can't be objective?

25  A.  That's the purpose of certain kinds of confrontation.  If I

Cross/Taylor - Dr. Silverman

1   may give an example, there was a murder case that I did a

2   couple of years ago, and the DA asked if I had seen evidence of

3   the damage to the victim, and I said no because it's

4   irrelevant.

5            My evaluation is not informed at all by something that

6   is emotionally stirring.  This is a mistake that the law often

7   makes, which is the same mistake that criminals make, which is

8   reacting with your emotional circuitry rather than your

9   intellectual circuitry.

10            THE COURT:  That's why we have rules of evidence.  But

11   I don't think the prosecutor is trying to inflame you at this

12   point.

13            THE WITNESS:  No, I'll be happy to look at it.  I'll

14   be happy to look at it.  But the point is, it is irrelevant to

15   my work.

16            THE COURT:  Okay.

17            THE WITNESS:  It's irrelevant.  I can imagine.  I have

18   seen naked children, including my own.

19   BY MS. TAYLOR:

20   Q.  Sir, if you could just take a look at the few images that

21   are in the notebook that's Government's Exhibit 7.

22   A.  Yeah.  Okay.  Again, this is totally irrelevant to my work.

23   Q.  Having seen those images, sir, do the images that you've

24   seen, do those change your opinion, any of the opinions that

25   are in your report in any way?

Cross/Taylor - Dr. Silverman

1   A.  Absolutely not, because, as I say, this has nothing to do

2   with my evaluation.

3   Q.  The fact that the images are not as the defendant described

4   them, clearly for the purpose of hygiene, as they show closeups

5   of the minor victims' vaginas with temporary tattoos placed on

6   them and there are some that show his fingers close to their

7   vaginas, the fact that those are different than the way he

8   described them to you --

9   A.  He didn't describe them to me.

10  Q.  Well, he told you, according to your report, that they were

11  for the purposes of hygiene.

12  A.  Yes, right.

13  Q.  Do those pictures look like they're for the purpose of

14  hygiene?

15  A.  Oh, I never thought that they would be.  That's what is

16  called a rationalization.

17  Q.  It's called a lie, isn't it, sir?

18  A.  Well, a rationalization is an answer given to meet certain

19  emotional needs of the speaker.  And it was very hard for him

20  to be frank about that, and he was kidding himself as much as

21  possible.  That's a rationalization.

22  Q.  Well, sir, your diagnosis or any medical provider's

23  diagnosis is only as good as the information that you're

24  provided.  Correct?

25  A.  That's correct.

Cross/Taylor - Dr. Silverman

1   Q.  So if he's providing you rationalizations and other types

2   of information, how accurate can your information be?

3   A.  Well, I think that it's not too much to ask of the forensic

4   examiner to recognize a rationalization when he sees one, and I

5   certainly was able to do that.

6   Q.  Now, you've made some comments about the defendant being

7   brain damaged.  You've used that term.  You had the

8   defendant -- the MRI scan done of the defendant.  It's not your

9   testimony that this MRI scan that the defense has attached to

10  their sentencing memo, that that shows any brain damage, is it?

11  A.  It shows something, and it's equivocal.  So it's

12  nonspecific.

13  Q.  So you're saying it could be something, or it could be

14  nothing?

15  A.  That's correct.

16  Q.  It doesn't show a brain tumor?

17  A.  It does not.

18  Q.  And you've also referenced that sleep apnea might have had

19  something to do with his behavior in raping four minor girls

20  and photographing their naked genitalia?

21  A.  That's correct.  We have the brain dysfunction, which might

22  have been -- might be due to sleep apnea, but we don't know, so

23  at this point we can't say specifically what the cause was, but

24  we sure know the result.

25  Q.  What's the result then, sir?

Cross/Taylor - Dr. Silverman

1   A.  The brain damage.  In other words, brain damage isn't just

2   something you see on an X-ray, brain damage is something you

3   assess by history and examination.

4   Q.  But you would agree with me that there are lots of people

5   that have brain tumors that don't run out and rape little girls

6   and take pornographic pictures of them.  Right?

7   A.  Well, there are people with definite lesions who do so, as

8   a matter of fact.

9   Q.  My question was, there are people that have brain tumors

10  that do not rape little girls and take pornographic pictures of

11  them?  I mean, my brother would be an example, my cousin would

12  be an example, the trooper sitting back there would be an

13  example.

14          MR. THORNTON:  Your Honor, do all those people have

15  brain tumors?

16          MS. TAYLOR:  They sure do.

17          MR. THORNTON:  Okay.  Interesting.

18          THE WITNESS:  Are you quoting facts then?

19  BY MS. TAYLOR:

20  Q.  Yes.  But I'm asking you, are there people that have brain

21  tumors that don't have --

22  A.  Sure.

23  Q.  -- that don't rape little girls and take pornographic

24  pictures?

25  A.  Sure.  May I tell you, the effect of a brain tumor, which

Cross/Taylor - Dr. Silverman

1    is a clear thing we can see on an X-ray of a certain kind,

2    this -- sorry, could the stenographer read me the last sentence

3    on that?

4    Q.   Well, I can ask you the question again.

5    A.   Okay.

6    Q.   Aren't there people --

7    A.   Oh, yes, the effects of brain -- okay.  Thank you.  The

8    effect of a brain tumor depends on where it is.  So strange

9    things have happened from brain tumors, that's for sure, but it

10   varies from case to case.  There are probably a thousand

11   different manifestations.

12   Q.   And Mr. Reed doesn't have a brain tumor.  The MRI showed

13   that.

14   A.   He doesn't have a brain tumor, but he has something wrong

15   with his brain.

16   Q.   And you thought that the MRI might show dementia.  Right?

17   A.   No, the MRI doesn't show dementia, but the history and the

18   examination show dementia.

19   Q.   Well, do you have Defense Exhibit 4, your letter dated

20   October 22nd, 2017?  Do you have a copy of that?

21   A.   May I have that date again?

22   Q.   October 22nd, 2017.

23   A.   Yeah, I've got it right here.

24   Q.   And that letter is entitled the Update on Jay Reed After

25   Lab Studies Review.  Right?

Cross/Taylor - Dr. Silverman

1    A.   Correct.

2    Q.   And in that first paragraph, you're talking about the

3    findings of the MRI.  Right?

4    A.   Right.  And there is that abnormality, but it's

5    nonspecific, and I don't use that as evidence.

6    Q.   But you indicate in the last couple sentences of that

7    paragraph, Whether this is related to my impression of a

8    dementing process is unclear but not likely.  The usual signs

9    of dementia, including enlarged ventricles and loss of brain

10   tissue, were not found.

11   A.   Correct.

12   Q.   Things that you could have seen on the MRI weren't there?

13   A.   That's correct, only what was there was there, and it was

14   not diagnostic.

15   Q.   And then in Defense Exhibit 5, your letter three days

16   later, October 25th, 2017, your last sentence is, A penal

17   placement is far from ideal.  And you mentioned that in your

18   testimony today.

19   A.   Correct.

20   Q.   Your opinion is that this defendant should not be

21   incarcerated.  Is that what that's a reference to?

22   A.   I would have been very happy to have this person in a

23   medical setting to have the total workup performed and after

24   that punishing for -- punishing a person for a behavior that he

25   is not responsible for is, in my judgment, immoral.

1      *MS. TAYLOR:*  Your Honor, those are all the questions I

2  have of Dr. Silverman.

3                               EXAMINATION

4  BY THE COURT:

5  Q.   Dr. Silverman, I have a couple of questions for you.

6  A.   Sure.

7  Q.   You have a very distinguished resume.

8  A.   Thank you.

9  Q.   You said that you were a treating physician or a treating

10  psychiatrist for a very long time.

11  A.   *(Nods head.)*

12  Q.   Yes?  Have you treated people before with abnormalities,

13  mental abnormalities related to sleep apnea?

14  A.   Sleep apnea is something we look for, absolutely, and the

15  course of treatment is a CPAP and related procedures.  Have I

16  ever seen or do I even know of sleep apnea as causing this kind

17  of behavior?  I really don't know.

18  Q.   You have not treated anyone for this?

19  A.   Well, no, actually, you see, once the diagnosis is made,

20  the treatment is pulmonary.  So the diagnosis is psychiatric,

21  but the treatment is pulmonary.

22  Q.   Sleep apnea is a fairly common diagnosis, isn't it?

23  A.   Correct.

24  Q.   If you go to the airport, you see a lot of people with

25  those machines.

Exam./Court - Dr. Silverman

1  A.  Including me.

2  Q.  Okay.  So of all the people who are treated for sleep

3  apnea, I would expect that there would be very few who would

4  have the kind of diagnosis that you're talking about as a

5  result of sleep apnea.

6  A.  That's probably true.  I don't know if there's any data, I

7  don't believe there is any data on that.  But that's an

8  interesting point.

9  Q.  So this late-life pedophilia, I think we all have different

10 views of what is late life.  Fifty-four doesn't sound like late

11 life to me.

12 A.  Well, actually, I think the term is "later life."

13 Q.  Later, okay.  Because in this court, I've seen people with

14 these kinds of charges from age 20 to age 80.  And if you ask

15 me of those what's late life, I would have said 75 and on.

16 Right?  But is there a definitive range for this late life?

17 A.  Well, it is frequently stated as happening in the 50s.

18 Q.  In the 50s?

19 A.  Often stated.  There is a related phenomenon which we

20 haven't even touched on, which may well be relevant, and that

21 is that when you have any kind of brain dysfunction later in

22 life, your judgment may be impaired and your self-control may

23 be impaired and anything can happen.  So nurses notice that

24 senile patients may be overly amorous and so forth.  So how

25 brain dysfunction affects you later in life, it varies from

Exam./Court - Dr. Silverman

1  person to person.

2  Q.  So we see that in nursing homes with Alzheimer's patients?

3  A.  Exactly.

4  Q.  Does the DSM-5 or the four or the three include a diagnosis

5  on this late-life pedophilia?

6  A.  Actually, no.  As I mentioned earlier, we really need to

7  improve that chapter.  When I read that, reread it recently, I

8  thought, this has to be revised.  But, you know, science is

9  always a work in progress.  Science is always correcting

10 itself.  And six, DSM-6, will do better, and I'll actually try

11 to remember to file a suggestion on that point.

12 Q.  So you were trained on the one?

13 A.  I was trained on one.

14 Q.  I was trained on the three, so I guess that makes us both

15 very old.  The one thing that I really need to ask you about is

16 this business of self-reporting.  So many psychiatric disorders

17 are based on self-reporting.  Right?

18 A.  Right.

19 Q.  So when we say that -- if we have a person who is clearly

20 engaged in behavior that would be common to somebody who is a

21 pedophile, when we draw the conclusion that it is late-life

22 pedophilia, we can only do that based on the self-reporting.

23 A.  Correct.

24 Q.  We know that there's no record of any such conduct, but we

25 depend on the person who is evaluated to tell us whether he's

Exam./Court - Dr. Silverman

1    had these instincts before.

2    A.   That's true.  But then, fortunately, we do have, and I had

3    in this case, informants like his sister, who, of course, was a

4    wonderful informant, and other individuals like an ex-wife and

5    I think father, probably.  There were a couple of family

6    members that I talked with that weren't very insightful, but

7    the sister was very insightful.

8    Q.   Even with people who know a defendant well, wouldn't you

9    agree that this is not the sort of thing that family members

10   are usually aware of?

11          I can personally tell you that there's hardly anybody

12   that ever comes in this courtroom on a charge like this where

13   it isn't a shock to the family.  They come, they describe a

14   good neighbor, good husband, good father, and they had no idea

15   that this person was in the basement downloading child

16   pornography or molesting the little boy next-door.  It really

17   isn't the kind of thing that's out there.

18   A.   That's true, that's true.  Of course, my overall point of

19   view is to understand the person --

20   Q.   Right.

21   A.   -- and not to blame.  I'm not sure if the name Benforado

22   rings a bell, but his book Unfair is so worthwhile, I recommend

23   it to every lawyer that I can find, including many in my

24   family.

25   Q.   All right.  I am told and I have read that there are --

Exam./Court - Dr. Silverman

1  there's a movement in the psychiatric profession that has

2  judged very harshly the criminal justice approach to the

3  treatment of pedophilia, that there are a large number of

4  professionals who believe that this type of behavior should not

5  be criminalized, and that when we look at what they view as the

6  draconian penalties, especially in federal court, that we're

7  going to look back on this 20 years from now and realize that

8  we've made a very big mistake.  I have a feeling that you might

9  be part of that group of professionals.

10 A.  Yeah, absolutely.  I've talked with Laura Magnani, who

11 wrote a book called, Beyond Prisons.  She's with the Quakers.

12 And they are very puzzled about this very problem and would

13 like to come up with a solution.  But they would also say that

14 punishment for something that is inherent, let's take the

15 inherent pedophilia, to punish somebody for something that's

16 inherent and they have really no control over seems immoral.

17 And I think we need to rethink the criminal justice system.  I

18 don't know if you've read my article, Criminal Injustice.

19 Q.  I will read it.

20 A.  You read it?

21 Q.  I have not read it.

22 A.  Oh, you have not read it.  And then I've upgraded that.

23 It's at least more known.  And it comes out really at a

24 revolutionary understanding of human nature, not that I've done

25 it, but I've read the people who have done the research and

1  done the thinking.  I'll be glad to send you something,

2  actually.

3  Q.  Okay.  Thank you.

4  A.  Be glad to.

5       *THE COURT:*  Any further questions?

6       *MR. THORNTON:*  Just briefly, if I could, Your Honor.

7  Thank you.

8                    REDIRECT EXAMINATION

9  BY MR. THORNTON:

10  Q.  I don't think I'm going over -- well, I might be sort of

11  going over some of the questions that Judge Kane just asked.

12       So from your investigation or -- I guess investigation

13  of this case, there was no evidence from anybody that you spoke

14  to that there was any prior interest in children.  Is that

15  correct?

16  A.  That --

17  Q.  I'm sorry, let me go over here.  There was no indication

18  from anybody that you spoke to that Jay Reed had a prior

19  interest in children?

20  A.  Yes, we have no history of that whatsoever, and I have a

21  lot of history.

22  Q.  Did his rationalizations or his avoiding admitting exactly

23  what he did, did that in any way affect your ability to

24  complete your evaluation?

25  A.  No, that's evidence.

Redirect/Thornton - Dr. Silverman

1   Q.  And did you ever expect the MRI to show a specific exact

2   cause for this?

3   A.  We didn't know what it was going to show.  And I can't be

4   precise as to what lesion would cause pedophilia, but I'll bet

5   there is a lesion somewhere, some brain tumor somewhere that

6   has caused abnormal sexual behavior like that.

7   Q.  And there is a lesion on his brain, on Jay's?

8   A.  Well, that's the nonspecific MRI abnormality, right.

9   Q.  And I guess the final question I had was, what's the

10  difference between a lesion and a tumor?

11  A.  Well, a lesion is anything that is a pathologic focus.  A

12  tumor is a multiplication of cells that may or may not be

13  malignant and that compress the brain and cause various kinds

14  of problems.

15  Q.  So tumors and lesions are --

16  A.  Lesion is the most general term.  An infection, like an

17  abscess, is a lesion if it's specific.  But lesion is any focus

18  of pathology.

19  Q.  And just finally, Dr. Silverman, is this your last case

20  that you have open?

21  A.  Yes, it is.

22  Q.  And then you're giving up your license after today?

23  A.  I am.

24  Q.  Okay.  Well, congratulations.

25  A.  But I'll be writing.

1          *MR. THORNTON:*  Okay.  Thank you, Dr. Silverman.  I
2     have no further questions.
3          *THE COURT:*  Anything else for Dr. Silverman?
4          *MS. TAYLOR:*  No, Your Honor.  Thank you.
5          *THE COURT:*  Doctor, thank you.  It was a pleasure
6     meeting you.  I will look forward to the article.
7          *THE WITNESS:*  Thank you.  I'd love to correspond with
8     you.
9          *THE COURT:*  Thank you.
10          *MR. THORNTON:*  Your Honor, we have no further
11     witnesses to present other than Mr. Reed.  I don't know if the
12     government has witnesses prior to allocution.
13          *THE COURT:*  Does the government have any witnesses?
14          *MS. TAYLOR:*  If I could have the court's indulgence
15     for just a moment.
16          *THE COURT:*  Ms. Taylor, do you need a few minutes?  We
17     can take a short recess here.
18          *MS. TAYLOR:*  If we could have just a five-minute
19     break, that would be great, Your Honor.
20          *THE COURT:*  We'll be in recess.
21          *COURTROOM DEPUTY:*  Court is in recess.
22     *(Recess taken.)*
23          *THE COURT:*  Ms. Taylor, do you have any witnesses?
24          *MS. TAYLOR:*  We do not, Your Honor.
25          *THE COURT:*  Mr. Thornton, anything else you want to

1    offer on your client's behalf?

2            MR. THORNTON:  Yes, Your Honor.  I know Mr. Reed would

3    like to speak, have allocution at the end.

4            Your Honor, we are asking you to vary to a sentence of

5    no more than the mandatory minimum here of 15 years.  And the

6    reason that we are asking for that variance is pretty much set

7    out in the sentencing memorandum that we filed about two months

8    ago.

9            First I would indicate from the testimony today that

10   there is no evidence of prior contact with children or an

11   interest in children on behalf of Mr. Reed, though Your Honor

12   clearly made a good point that people do hide that regularly.

13   But it would be -- if there were such evidence, it would be

14   probative, but since there isn't any, I don't think we can even

15   consider that.

16           Your Honor, we would suggest that the characteristics

17   of Mr. Reed show that a variance of 15 years is an appropriate

18   sentence in this matter.  Clearly a sentence of 1,080 months is

19   a death sentence for Mr. Reed.  He's not going to live 90 more

20   years.

21           It's kind of amazing to me that you can even come up

22   with a sentence from the guideline that exceeds the absolute

23   maximum.  It's like the Voyager spacecraft seems to have left

24   the complete heliosphere of our galaxy and moved into a range

25   where you can't even have those sentences.

1          Your Honor, we would suggest that Deb Dallmann's

2    letter and her testimony here today, the family video, the

3    character letters attached to the sentencing memorandum all

4    indicate that Mr. Reed is somebody who is deserving and can

5    make the best of a variance if Your Honor were to do that for

6    him.  And we have evidence that he can do better and that he

7    can conform to the rules of society.

8          He's been in Dauphin County and Columbia County Prison

9    for over three years.  He has no writeups, no disciplinary

10   difficulties whatsoever.  And, in fact, he was even put in

11   charge of the laundry on several occasions at Columbia County

12   Prison.  They move the laundry assignments on and off, but

13   Mr. Reed had a very good relationship with all the guards up

14   there, and I know they felt that he did a very good job with

15   the laundry.

16         As far as his prior record, Your Honor knows that he

17   only has one prior conviction, a DUI from 1990.  All those

18   things, I think, show well for the characteristics of Jay and

19   indicate that he can make the best of a variance if Your Honor

20   will grant him such a variance.

21         His history is also set out in the presentence report

22   and also Dr. Dattilio's report.  He's always been working.  He

23   did go in the Army for a while.  He's not a guy who's lying

24   around, he's a conscientious person who is constantly active.

25         And I think Your Honor knows from the video that the

1  parents made for the court that Mr. Reed is needed at home.  I

2  know that Mom and Dad are certainly older, and 15 years may

3  not -- they may not be here, but certainly he's needed at home

4  to help take care of things.  And he has, unfortunately,

5  jeopardized that, and that hurts him to the core.

6       Your Honor, he does have progressive dementia, as

7  indicated by Dr. Silverman.  And, in fact, just my last visit,

8  it was clear that Jay is forgetting stuff even now.  Even

9  between my visits, he's less and less there and less and less

10  able to recall things that we've talked about in the past.  He

11  has had the stroke, the diabetes.  He has the CPAP, which seems

12  to be helping him at least with his ability to sleep and

13  hopefully is giving him the oxygen to his brain that he really

14  needs.

15       I think all of those things demonstrate what

16  Dr. Silverman testified to, that there was an atypical switch

17  here.  He wasn't a pedophile, he wasn't a guy who wanted to

18  have anything to do with children in a sexual way, and suddenly

19  it occurred, which makes you think that what Dr. Silverman was

20  testifying to here today is correct, that there is a lesion,

21  there is some difficulty, something has occurred to him.  I

22  know Jay has not felt right for a long time after the stroke

23  and his diabetes.

24       Your Honor, the sentence you impose here must be

25  substantively reasonable, as Your Honor knows, under 3553(a)

1    and not greater than necessary.  We would suggest to you that

2    Jay is unlikely to reoffend, and we spelled that out in the

3    sentencing memorandum that we filed, that his age, the

4    sentencing guideline statistics, and also just the plain

5    opportunity to want to reoffend is very small considering his

6    age.

7          He's unlikely to be a future danger, mostly because he

8    wasn't a danger before this, but also because he will be on

9    supervised release for at least five years after the sentence

10   is imposed and will have to register under Megan's Law probably

11   for most of the rest of his life.  And even Dr. Dattilio

12   indicated that he was only a moderate risk of reoffending.

13         Your Honor, Mr. Reed needs treatment, medical

14   treatment, and we would ask you to suggest either Butner or the

15   medium security facility at Allenwood, which both have sexual

16   offender programs, as the place of incarceration.  What we ask

17   you not to do is lock Jay up and throw away the key, and that's

18   what the guidelines ask for here.  They ask you to throw away

19   the key.  They ask you for him to die in prison.

20         But he's being punished in a number of different ways,

21   not just the physical punishment, not just jail time, he's got

22   a brother who won't talk to him.  More than likely Mom and Dad

23   aren't going to be here when he gets out.  Other inmates will

24   torture him.

25         And as Deb mentioned, he's going to be very lucky to

1    survive this without significant physical pain from not just

2    being incarcerated, but from other inmates.  And I think Your

3    Honor is aware of the difficulties that inmates with these type

4    of offenses have, and that's why we're asking for that specific

5    location of incarceration.

6           Certainly here the pedophilia is a late-in-life onset,

7    which we believe is caused by the brain injury, the dysfunction

8    for Mr. Reed.  He's never done it before.  There's no

9    indication that he'll ever do it again.  He never distributed

10   anything.  He never shared anything.  He never even showed

11   anything to anyone else.

12          Your Honor, 90 years in this case is greater than

13   necessary.  Mr. Reed is remorseful and redeemable, and we ask

14   you to give him a sentence less than 90 years, and we would

15   suggest 15 years, which is the mandatory minimum.

16          *THE COURT:*  Does your client wish to speak?

17          *MR. THORNTON:*  Yes, Your Honor.  Would you like us to

18   approach the bench?

19          *THE COURT:*  You can stay there.

20          *MR. THORNTON:*  Stay here.

21          *THE DEFENDANT:*  First off, I'd like to thank everybody

22   for being here and apologize to everybody for my attire and not

23   being able to shave and stuff like that.  It's just -- that's

24   the way the jails and everything operate.

25          And mostly I wanted to apologize to the family and say

1    how sorry I am for anything that happened.  I tried as hard as
2    I could to make everything good for them, but I went astray,
3    and I don't know what happened.  I don't know where it went
4    downhill.  But I do apologize for everything, and I just hope
5    that you all forgive me.  Thank you.
6              *MR. THORNTON:*  We have nothing else, Your Honor.
7              *THE COURT:*  Okay.  Thank you.  Ms. Taylor.
8              *MS. TAYLOR:*  Thank you, Your Honor.  This is a case,
9    as the court is aware, that based on the presentence report,
10   that the guideline range for the base offense level of 46 would
11   actually call for a natural life sentence but for the statutory
12   maximums that are imposed in this case with the four counts.
13   That is what results in the 90-year or the 180-month advisory
14   guideline range.
15             And that is, as the court knows, what the government
16   is requesting.  We are requesting that the court impose the
17   1,080-month sentence that the guidelines call for.  That is the
18   statutory maximum on each of the four counts, and we're asking
19   that the court run those sentences consecutive for the total of
20   90 years' imprisonment here.
21             What the defense is asking for is just simply -- this
22   isn't a mandatory minimum case.  They're asking for a 15-year
23   sentence, which is, of course, the mandatory minimum on the
24   production of child pornography count, and the facts of this
25   case suggest that it is not a mandatory minimum case.

1          The defendant in this case is a child rapist.  He is a

2   producer of child pornography.  There are approximately 200

3   images that are of the known victims in this case that were the

4   victims of the molesting at the hands of this defendant and/or

5   the rapes that the victims suffered.  And these victims at the

6   time of these crimes were ages nine through thirteen.

7          He's also a collector of child pornography.  There

8   were approximately 300 images that constituted child

9   pornography and one video that showed prepubescent minors that

10  were performing sex acts.  Some of those images included

11  bondage, urination, oral and anal penetration by adults on

12  these children, and there were a number of those that were

13  known series that were identified by NCMEC.

14         But the physical, the physical abuse that the victims

15  suffered in this case was not enough.  He also manipulated the

16  victims in this case.  The way he got them to engage in some of

17  these acts was by manipulating them, buying them gifts and

18  giving them money, which certainly suggests the predatory

19  behavior that Dr. Dattilio indicated in his report that he sees

20  in the defendant.

21         But one of the reasons this case is not a mandatory

22  minimum case is because the abuse did not stop when the

23  defendant got arrested.  After he was arrested and

24  incarcerated, the defendant wrote two letters.  One of them was

25  addressed to one of the minor victims, and one of them was

1    addressed to her grandmother.

2           Now, the defense, earlier in the hearing, talked about

3    the two obstruction charges, which are Counts 3 and 4 that the

4    defendant pled to, and indicated that they were not true

5    obstruction charges and that the letters were more like letters

6    talking about please don't prosecute me, was the way

7    Mr. Thornton characterized what Mr. Reed wrote in these

8    letters.

9           But after raping these little girls, photographing

10   them, downloading images of commercial child pornography,

11   getting locked up for those crimes, he then, from the prison,

12   writes what are absolutely letters that show obstruction and

13   tampering with witnesses.

14          The letter to the grandmother, which is in an envelope

15   with his name, Mr. Reed's name and inmate number on it, the

16   letter has his inmate number on it, just reading the relevant

17   portion of the letter to the grandmother says:  Why do they

18   have to go?  They already gave statements.  Don't volunteer

19   anything extra.  And later in the letter it mentions two of the

20   victims by name and then says, They know I didn't do anything.

21          The letter to the minor victim that the defendant

22   wrote from jail says, at least the relevant part says, I sure

23   will be glad when this is all over so I can be with you again.

24   And the last line says, I hope you and the name of one of the

25   other victims are not talking to anyone about this case.  He

1    couldn't even leave these children alone once he was locked up

2    in jail.

3            Now, the court just heard from Dr. Silverman, the

4    defense's expert, and I won't spend a lot of time on arguing

5    about his opinions, but obviously he presents what I think

6    is -- could be characterized as a fringe opinion about

7    pedophilia and these types of cases, discussing later-in-life

8    pedophilia, which is a concept that I don't believe --

9    certainly he acknowledged does not exist in the DSM-5, which is

10   the current edition.

11           He talked about the defendant having brain dysfunction

12   which is what caused him to engage in these criminal

13   activities, but he also acknowledged on cross-examination that

14   what he was calling brain dysfunction may be something or may

15   be nothing.

16           He also acknowledged that a lot of the information

17   both in his report and Dr. Dattilio's was based on

18   self-reporting.  And his diagnosis of neurocognitive disorder

19   was, I would submit to the court, completely at odds with the

20   detailed history that you see in Dr. Dattilio's report.

21           And Dr. Silverman's opinion that the defendant should

22   not be incarcerated because he should not be punished for

23   something that is simply inherent and that what the criminal

24   justice system is doing is immoral, I'll just leave that for

25   the court's thoughts.

1        A sentence of 90 years in this case, Your Honor, would

2    be appropriate under any consideration of the 3553(a) factors

3    and would be in line with other cases that have been sentenced

4    in this court, and I outlined some of those for the court in

5    the memorandum that we filed yesterday.  But the one I wanted

6    to highlight for the court was *United States v. Daniel Curran.*

7        That was actually a case that was presided over by

8    Judge Caldwell, and in that case, he sentenced the defendant,

9    Daniel Curran to 70 years, 20 years less than what the

10   government is asking for in this case, but the 70 years in

11   Mr. Curran's case was the statutory maximum that was available

12   to Judge Caldwell in that case.  So we asked for the statutory

13   maximum in that case as we are doing here.

14       The Daniel Curran case has a lot of similarities to

15   Mr. Reed's case, which is why I bring it to the court's

16   attention.  In Mr. Curran's case, the defendant also had no

17   prior convictions and no history of sexual abuse, and the

18   United States could present to the court in that case no

19   evidence that the images in that case had been distributed.

20       That's not to say they hadn't.  Just like in

21   Mr. Reed's case, we simply don't know.  There is no evidence

22   about whether they have or have not been distributed, just like

23   there is no evidence about whether Mr. Reed, and in

24   Mr. Curran's case, the same there, whether Mr. Reed has or has

25   not been involved with any of these similar activities prior to

1   when he was caught at the age of 54.

2           In Mr. Curran's case, he also was sexually abusing,

3   hands-on sexual abuse of a nine-year-old minor victim, but in

4   his case, there was only one victim as opposed to the multiple

5   victims we know exist in Mr. Reed's case.  He also documented

6   that abuse by photographing and videoing the minor's genitals,

7   similar to Mr. Reed's.  And he also attempted to obstruct

8   justice just like Mr. -- or in a similar way that Mr. Reed did.

9           Based on those facts that are both similar to

10  Mr. Curran's case that we find in Mr. Reed's case, the

11  government in that case asked for a statutory maximum sentence

12  where the counts were run consecutively.  And Judge Caldwell

13  did, in fact, sentence Mr. Curran in that fashion, which led to

14  the 70-year sentence there, and that is what we are requesting

15  in Mr. Reed's case, a maximum sentence on each count for the

16  90-year sentence.

17          I do have the very few selection of images that we

18  presented to Dr. Silverman in this case that we marked as

19  Government's Exhibit 7, if the court would like to review them.

20  I think there are only ten.

21          But finally, Your Honor, the victims in this case

22  clearly have been robbed of their innocence, and the victims

23  will suffer for a lifetime because of the abuse that was meted

24  out by Jay Reed.  To protect these victims and to protect the

25  community and to keep this man from victimizing any other

1    little girls in the future, the United States is requesting

2    that the court impose a maximum sentence of 90 years.

3          The defendant's sister made a very candid and

4    compelling statement to the court earlier today, and one of the

5    things she said really resonated with me.  She indicated that

6    Mr. Reed's friends had said to her that Mr. Reed always had

7    their backs.  Well, we're asking the court to have the backs of

8    the victims and sentence Mr. Reed to 90 years.

9          *THE COURT:*  Thank you, counsel.  I don't have to tell

10   you these are difficult cases.  They're difficult for the

11   lawyers, for the court, and I know how difficult they are for

12   the family.  I have not seen a family come before the court on

13   a case like this who didn't come here absolutely shocked at the

14   nature of the penalties that are potential here and also

15   shocked at some of the conduct that they have heard their loved

16   one engaged in.

17         Most of the people who engage in child pornography

18   cases are productive members of society in so many other

19   places.  They're good neighbors, they're good friends.  It's

20   something that the family and the friends just really can't

21   understand and, quite frankly, none of us really understand,

22   either, but here we are.

23         There is a guideline range of 1,080 months.  And as

24   counsel has noted, the maximum penalty under the statute is

25   life, and the guideline range caps that because of the

1    statutory provisions.

2           On Count 1, the statutory provision is a minimum 15,

3    maximum 30 years.  Count 2, no minimum, but a maximum of 20

4    years.  Count 3, a maximum of 20 years.  And Count 4, a maximum

5    of 20 years.  The court is called upon to fashion a sentence

6    that's sufficient but not greater than necessary to meet

7    sentencing objectives and to weigh the characteristics of the

8    defendant with the nature and circumstances of the crime that

9    brings him before the court.

10          As counsel have noted, the defendant is now in his

11   late 50s.  He's in poor health.  He suffers from diabetes,

12   sleep apnea.  But he's a person who has enjoyed a good family

13   upbringing, adequate education, and someone who has been

14   employed over a lifetime and even served in the military.  Up

15   until this offense, he was relatively crime-free for most of

16   his adult years with only a DUI conviction.

17          So the court must measure this man against the

18   reprehensible acts that bring him before the court.  In

19   evaluating the defendant's conduct, of course, the court has to

20   weigh the willfulness of what he has done, and Dr. Silverman's

21   testimony is very important in doing that.

22          I have listened very carefully, and, quite frankly, I

23   find much of the testimony that I heard fanciful and really not

24   based in science.  Were he here on a Daubert motion, I would

25   likely reject the conclusions that he's offered to the court.

1   I do find that the defendant acted willfully and that he

2   violated four young victims and left them with lifelong

3   consequences as a result of his conduct.

4          He's admitted producing pornographic images of

5   prepubescent children.  He's admitted possessing a large case

6   of child pornography, including images identified by the Center

7   for Missing and Exploited Children.  And, worst of all, he's

8   admitted violating four children between the ages of nine and

9   thirteen.  And two of these children were in his care, and he

10  not only violated them physically, but he violated their trust

11  and took advantage of the opportunity that was placed in him.

12         I believe that a sentence below the recommended

13  guideline range is sufficient to punish, deter, promote respect

14  for the law, and reflect the seriousness of the defendant's

15  conduct.

16         I find that on Count 1, only a sentence of the maximum

17  would reflect guideline objectives -- or sentencing objectives.

18  That would be the 30 years.  This involves four victims.  Count

19  2, countless victims on the pornography count, and that maximum

20  of a 20-year sentence is appropriate under the circumstances.

21  On Counts 3 and 4, the tampering counts, I believe that a

22  ten-year sentence would be sufficient but not greater than

23  necessary to promote sentencing objectives.

24         Pursuant to the Sentencing Reform Act of 1984, it's

25  the judgment of the court that the defendant, Jay Eugene Reed,

1   is hereby committed to the custody of the Bureau of Prisons to
2   be imprisoned for a term of 840 months.  This term consists of
3   360 months on Count 1, 240 months on Count 2, 120 months on
4   Count 3, and 120 months on Count 4, all to be served
5   consecutively.
6          The court finds that the defendant has the ability to
7   pay a fine.  It's ordered that he pay to the clerk, U.S.
8   District Court, a sum of $1400 consisting of special
9   assessments totaling $400 due immediately and a fine of $1,000
10  on Count 1.
11         During the term of imprisonment, the balance of the
12  restitution is payable every three months in an amount after a
13  telephone allowance equal to 50 percent of the funds deposited
14  into the defendant's inmate trust fund account.
15         In the event the restitution is not paid in full prior
16  to the commencement of supervised release, the defendant shall,
17  as a condition of supervised release, satisfy the amount due in
18  monthly installments of no less than $35 to commence 30 days
19  after release from confinement.
20         On release from imprisonment, the defendant shall be
21  placed on supervised release for a term of life.  This term
22  consists of life on each of Counts 1 and 2 and terms of three
23  years on each of Counts 3 and 4, all to be served concurrently.
24         Within three days of release from the custody of the
25  Bureau of Prisons, the defendant shall report in person to the

1    probation office in the district to which he is released.

2             While on supervised release, the defendant shall not

3    commit any federal, state, or local crime and shall not possess

4    a dangerous weapon.

5             The defendant shall comply with the standard

6    conditions that have been adopted by the court and with the

7    following additional conditions:

8             You must cooperate in the collection of DNA as

9    directed by the probation officer.  You must not unlawfully

10   possess a controlled substance.  You must refrain from any

11   unlawful use of controlled substances.  You must submit to one

12   drug test within 15 days of commencing supervision and to at

13   least two periodic drug tests thereafter as determined by the

14   court.

15            You must comply with the requirements of the Sex

16   Offender Registration and Notification Act as directed by the

17   probation officer, the Bureau of Prisons, or any state sex

18   offender registration agency in the location where you reside,

19   work, are a student, or were convicted of a qualifying offense.

20            You must participate in a mental health treatment

21   program and follow the rules and regulations of that program.

22   The probation officer, in consultation with the treatment

23   provider, will supervise your participation in the program,

24   which may include an evaluation and completion of any

25   recommended treatment.  You must take all mental health

1   medications that are prescribed by your treating physician.

2          You must not incur new credit charges or open

3   additional lines of credit without the approval of the

4   probation officer.  You must provide the probation officer with

5   access to any requested financial information and authorize the

6   release of any financial information.  The probation officer

7   may share financial information with the United States

8   Attorney's Office.

9          You shall apply all monies received from income tax

10  refunds, lottery winnings, judgments, and/or other anticipated

11  or unexpected financial gains to the outstanding court-ordered

12  financial obligation.

13         If the judgment imposes a financial penalty, you must

14  pay the financial penalty in accordance with the schedule of

15  payments.  You must also notify the court of any changes in

16  economic circumstances that may affect the ability to pay the

17  financial penalty.

18         You must submit your computers or other electronic

19  communications or data storage devices or media to a search.

20  You must warn any other people who use these computers or

21  devices capable of accessing the Internet that the devices may

22  be subject to searches pursuant to this condition.

23         A probation officer may conduct a search pursuant to

24  this condition only when reasonable suspicion exists that there

25  is a violation of a condition of supervision and that the

1  computer or device contains evidence of this violation.  Any

2  search will be conducted at a reasonable time and in a

3  reasonable manner.

4          You must allow the probation officer to install

5  computer monitoring software on any computer you use.  To

6  ensure compliance with the computer monitoring condition, you

7  must allow the probation officer to conduct initial and

8  periodic unannounced searches of any computers subject to

9  computer monitoring.

10          These searches shall be conducted for the purposes of

11  determining whether the computer contains any prohibited data

12  prior to the installation of the monitoring software, to

13  determine whether the monitoring software is functioning

14  effectively after its installation, and to determine whether

15  there have been attempts to circumvent the monitoring software

16  after its installation.  You must warn any other people who use

17  these computers that the computers may be subject to searches

18  pursuant to this condition.

19          You must participate in a sex offense specific

20  treatment program and follow the rules and regulations of that

21  program.  The probation officer will supervise your

22  participation in the program that may include an evaluation and

23  completion of any recommended treatment.

24          You must participate in plethysmograph testing as part

25  of the required participation in a sex offense specific

1   assessment and/or treatment.  You must participate in visual

2   response testing as part of the required participation in a sex

3   offense specific assessment or treatment.

4          You must submit to periodic polygraph testing at the

5   discretion of the probation officer as a means to ensure that

6   you're in compliance with the requirements of your supervision

7   or treatment program.

8          You must not have direct contact with any child you

9   know or reasonably should know to be under the age of 18, not

10  including your own children, without the permission of the

11  probation officer.  If you do have any direct contact with any

12  child you know or reasonably should know to be under the age of

13  18, not including your own children, without the permission of

14  the probation officer, you must report this contact to the

15  probation officer within 24 hours.

16         Direct contact includes written communication,

17  in-person communication, or physical contact.  Direct contact

18  does not include incidental contact during ordinary daily

19  activities in public places.

20         You must not go to or remain at any place where you

21  know children under the age of 18 are likely to be, including

22  parks, schools, playgrounds, and child care facilities.  You

23  must not go to or remain at a place for the primary purpose of

24  observing or contacting children under the age of 18.

25         You must not communicate or otherwise interact with

1   the victims or any member of their families, either directly or

2   through someone else, without first obtaining the permission of

3   the probation officer.

4           And you must submit your person, house, property,

5   residence, vehicle, papers, computers, other electronic

6   communications or data storage devices or media or office to a

7   search conducted by the U.S. probation officer.

8           Failure to submit to a search may be grounds for

9   revocation of release.  You must warn any other occupants that

10  the premises may be subject to searches pursuant to this

11  condition.

12          The probation officer may conduct a search under this

13  condition only when reasonable suspicion exists that you have

14  violated a condition of supervision and that the areas to be

15  searched contain evidence of this violation.  Any search must

16  be conducted at a reasonable time and in a reasonable manner.

17          Mr. Reed, you do have a right to appeal your

18  conviction if you believe that your guilty plea was somehow

19  unlawful or involuntary or if you think there was some other

20  fundamental defect in the proceedings that you did not waive by

21  entering a guilty plea.  You also have a statutory right to

22  appeal your sentence under certain circumstances, particularly

23  if you think the sentence is contrary to law.

24          With few exceptions, any Notice of Appeal must be

25  filed within 14 days after sentence is imposed on you.  If

1    you're not able to pay the costs of an appeal, you may ask the

2    court for leave to appeal in forma pauperis, and if you

3    request, the Clerk of Court will prepare and file a Notice of

4    Appeal on your behalf.

5            Counsel, is there anything else for the record?

6            MR. THORNTON:  Would Your Honor recommend Butner or

7    Allenwood medium as a place of incarceration?

8            THE COURT:  Mr. Thornton, are you aware whether Butner

9    is still being used for sex offender treatment?  The last I

10   heard, it was not.

11           MR. THORNTON:  As far as I heard recently it was, but

12   I have not heard in the last three or four months.

13           THE COURT:  Ms. Taylor may know.

14           MS. TAYLOR:  Your Honor, there are -- the last thing

15   we've been told, within the last six months by the prison, that

16   there are a number of facilities that are being used.  One of

17   them is out in Arizona.  I'm not sure that Butner is one of

18   them, but the Bureau of Prisons is definitely going to

19   designate Mr. Reed --

20           THE COURT:  I would assume that you would want the

21   defendant to be housed as close to his family as possible,

22   provided that there would be the sex offender program.

23           MR. THORNTON:  Allenwood is definitely one of those

24   facilities.

25           THE COURT:  Allenwood?  Okay.

1          *MR. THORNTON:*  Butner just has the dual treatment

2     possibilities because they also have the hospital.

3          *THE COURT:*  Right.

4          *MR. THORNTON:*  But Allenwood would be the closest to

5     the family.

6          *THE COURT:*  Okay.  So I think Ms. Taylor is right in

7     that regard, that the Bureau of Prisons will certainly do a

8     medical evaluation immediately and will try to find that place.

9     If it's Butner, I have no problem recommending it.

10          *MR. THORNTON:*  If Your Honor would recommend Allenwood

11     medium as the primary place.

12          *THE COURT:*  All right.  Ms. Taylor, anything else?

13          *MS. TAYLOR:*  Not from the government, Your Honor.

14          *THE COURT:*  All right.  Thank you, counsel.  We'll be

15     in recess.

16       *(Whereupon, the proceedings were concluded at 4:05 p.m.)*

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4         I, Lori A. Shuey, Federal Certified Realtime Reporter, in

5    and for the United States District Court for the Middle

6    District of Pennsylvania, do hereby certify that pursuant to

7    Section 753, Title 28, United States Code, that the foregoing

8    is a true and correct transcript of the stenographically

9    reported proceedings held in the above-captioned matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12        Dated in Harrisburg, Pennsylvania, this 31st day of

13   December, 2018.

14

15                         **/s/ Lori A. Shuey**
                           Lori A. Shuey
16                         Federal Certified Realtime Reporter

17

18

19

20

21

22

23

24

25